Our next case this morning is Novelis Corporation v. National Labor Relations Board. Good morning, Your Honors. My name is Kurt Powell and I represent the appellate Novelis Corporation in this matter. My focus today will be on why the board's decision to issue a bargaining order in this case cannot be upheld under the law of this circuit. First, the law of this circuit requires the board to consider change in mitigating circumstances in deciding whether to issue a bargaining order. Second, the law of this circuit requires the board to develop an evidentiary record on factors such as lingering effects, the impact or effects of any unfair labor practices on the employees themselves, and whether the employer has committed any further unfair labor practices. Remind me of what happened on that point in the district court. Was the district court asked to issue a gazelle order? Yes. In the 10-J proceeding before Judge Sharpe, the National Labor Relations Board asked Judge Sharpe to enter full relief. He entered all of the relief that was requested by the board with the exception of the bargaining order, and the board never appealed that determination. Just remind me of what his reasons for not doing that were. His reasons included questions as to the majority status, as well as the fact that there was significant employee activity suggesting that they did not want to be represented by the Steelworkers Union in this case. What was that? The employees, the evidence indicates, and some of the evidence was admitted into this record, some of the evidence was excluded from this record, that the employees themselves engaged in a significant campaign against representation by the steelworkers, and Intervenors Council, I believe, will address that point in more depth. At this moment, there is no bargaining. There is no union. That is correct. There is no . . . There is no recognized union. That is correct. Now, how far are we at this moment as we speak from the election? We are now over three years from the election. The election was in February of 2014. We're now three and a half years later. How much turnover has there been among the workforce that you're employing, your client? Over one hundred employees who were employed at the time are no longer employed by Novellis, and more significantly, over three hundred and twenty employees who have been hired with the continued growth and expansion of the Oswego plant. The percentages are very difficult to understand exactly what is supposed to be compared with what. So just to make sure you have at least the wrong numbers down, a hundred employees out of an original group of approximately . . . Six hundred. Three hundred. Of six hundred. Correct. Okay. These numbers that you're referring to are in your brief, but not in the record, right? Because you've given updated figures. That's correct. And what date do you focus on as the date that we should be considering in determining whether the board adequately accounted for changed circumstances? And we'll give you a little extra time here. Thank you, Your Honor. We think that the relevant time period is both now, and the court has recognized that and accepted counsel's representations as to the changed circumstances in arguments such as these, and also then at the time the bargaining order was issued by the board. And at that time, the numbers were approximately 250 new employees. I think the number was 255 new employees, and approximately 80 employees had left. So . . . Just to try to keep . . . Again, I want to get back to my wrong numbers question. We started with about 600 people who are relevant to this discussion, right? And a hundred have left. And you say 300 have been hired. That includes 200 new jobs and a hundred replacements. Not necessarily specific replacements. Maybe the jobs have shifted. But it would be double counting to say it's 100 minus and 300 plus, right? We would calculate the percentage by saying the number of employees that were there, minus the number of employees who left, plus the new employees who've hired, which would come up with a turnover rate in this case . . . The real point is that there are a lot of people who haven't been heard from on this point. Right. Exactly. And what is the size of the workforce of the bargaining unit now? Presently, the size of the workforce is over 800, 818 employees, which would also mean that the number of union cards originally signed would be less than a majority of this workforce. But so it was 600. It's now 818. Correct. And as of the time of the bargaining order, had a similar . . . has that expansion occurred or is that recent? At the time of the bargaining order, the expansion had also occurred. At that time, the number of employees was approximately 770. Okay. So it had gone up 170. Yes. All right. Your Honor, if I may just address one other point. Please, please. Take a couple minutes. Here, the board's decision completely fails to satisfy the requirements. The board flatly refused to consider change in mitigating circumstances and repeatedly denied Novellis' timely and repeated motions to introduce that evidence into the record. For that reason alone, the bargaining order cannot be enforced under the law of this circuit. Likewise, the general counsel failed to present any evidence as to the impact of any unfair labor practices on the employees. Without such evidence, the board can't possibly have conducted the analysis required by this court and without that evidence and without the analysis, the bargaining order cannot be upheld. But the board says that the change in . . . the give back on the terms and conditions of that knowledge of that would have been, you know, passed forward through the law of the workforce and so on. And notwithstanding the departure of some of the people who made important speeches that were also considered to be ULPs, that these were significant enough and extraordinary enough actions that that would . . . that a fair election couldn't be assured even were it to take further account of the changed circumstances. And part of my concern in dismissing that as reason is that the . . . we'd be creating a system potentially in which the employer has incentives just to delay and delay and delay and create circumstances that have changed and undercut any sense of punishment, if you will, for intervening in the election in an unlawful way. Why . . . why . . . why should we take account of these changed circumstances and overlook the gravity of the board's findings on the ULPs that occurred contemporaneously with the election? First of all, the law of the circuit requires the board to consider change in mitigating circumstances. As this court stated in Windsor Industries, that's the first and probably the most important reason. And second, the board presumed dissemination and this court has said in Marion Roar that it will not presume dissemination when the issue is whether or not a fair election can be conducted. And here . . . Well, the board did . . . excuse me, but the board did consider. It said even were we to consider changed circumstances in its lengthy footnote, it would find that they would not mitigate adequately the effect of the acts that had been undertaken by the employer. Why . . . why is that not enough? May I answer, Your Honor? Yes, please. Footnote 17 is completely . . . fails to satisfy this court's requirements for evidence and analysis. As this court stated in the Heads and Threads case, the board must take evidence and make appropriate findings, I will say based upon substantial evidence, with respect to changed circumstances and other mitigating factors. If the board doesn't take the evidence, it can't conduct an analysis and it can't make findings based upon substantial evidence. The board's refusal to take that evidence and its cursory treatment in a footnote is insufficient as this court recognized in J. Cody where a similar kind of footnote was treated by the board, as this court has recognized in JLM, and as this court has recognized in many of the other cases in which it has denied bargaining orders. In approximately fifteen cases since the issuance of Jamaica Towing, this court has denied bargaining orders involving conferral of benefits, just like the ones at issue here, and in many other types of unfair labor practices. Each time, it was because the board refused to consider changed mitigating circumstances and refused to develop the evidentiary record and conduct the proper analysis to justify a bargaining order. Just one question before you sit down. Did any of this conduct which is alleged to have irredeemably tainted the voting pool, did any of it take place after the 10-J injunction was read to the workforce? No, Your Honor, and that's a very significant factor. The board in its decision pretends as if the 10-J relief in this case was never entered and that it did not exist. It's undisputed, and the ALJ noted this in his opinion, that the novellus has fully complied with the 10-J order for over three years now. Specifically, when did this reading occur? September 11, 2014. And the reinstatement of Mr. Hebert to his former positions also occurred at that time. And so there are no lingering effects that are present in the record, and in fact, we've had three years of uninterrupted compliance with no further unfair labor practices by novellus. Thank you. Thank you. Very good. Thank you. We'll hear . . . you have three minutes for rebuttal, and we'll hear from Mr. Aron on behalf of the intervenors. Good morning. Thank you, Your Honors. Thomas Aron from Von Schoenecke and King on behalf of the intervenor employees. My clients are long-tenured employees at novellus. They've witnessed the growth of that plant and the expansion, as novellus counsel has indicated. They were actively employed during the campaign. They studied the issue of representation by the steelworkers and made the determination that they did not want that representation. They were particularly turned off by the local leadership and rejected the notion that those individuals should be their representative. They conducted an independent campaign during the two months leading up to the election, and they won the election. They asked this court for the opportunity to vote again for themselves and for their many coworkers. We believe that the board's decision to impose a bargaining order is fatally flawed in a number of ways. Echoing counsel for novellus, this court has said that there is an obligation on the part of the board to evaluate not only subsequent circumstances but surrounding circumstances and to take evidence on that issue. There is evidence in the record. My clients presented a petition signed by 200 employees. That evidence was generated as part of the 10-J injunction and included in this record. In that, those employees stepped forward, pulled aside the curtain of the voting booth and said, we had a fair opportunity to vote in the secret ballot election. We were not coerced, threatened or intimidated by any conduct, action or statement made by any novellus official, and we ask for the opportunity to vote again. Your honors, the NLRB does not vote in that election. The union does not vote in that election. Novellus does not vote in that election. It is strictly a matter for the employees. The employees have the opportunity to vote for a decertification, right? If the bargaining order were enforced, they can organize and vote to decertify. Why isn't that adequate as a remedy? That's a very limited opportunity, your honor. If the bargaining order were in place, it would give Novellus and the union a reasonable opportunity to negotiate a contract, which the board considers six months to a year, and no decertification petition can be filed during that reasonable opportunity. And then if those two parties come together and reach an agreement, the board has a rule that says an agreement is an election bar for three years. And no election petition can be filed during that period. It's a very difficult position to tell someone who has voted against the union in a very  A union that they specifically do not want will control their economic circumstances, their livelihood, for four years. And we believe that's wholly inadequate, particularly where the board did not take the effort to analyze the circumstances. And in addition to the subsequent circumstances that Novellus counsel spoke to, we believe it's important to look at the surrounding circumstances, as this court has said. So we're talking about the campaign that was conducted. Your honor spoke about the wage increase issue. That occurred early in January, occurred the first week of January. There were two months of discussions and active participation on all sides. The union had the opportunity, if it believed that this election could not be conducted fairly, to block the election. It did not do so. The employees had the opportunity to vote, and they should have the opportunity again. And I take it any new election would be supervised by the NLRB? Yes, your honor. And while there's this concern that even if the union were in place, it would have to respect the interests of the employees opposed to the union, we have no confidence in that. If we can't have the confidence in an NLRB election, we don't think we can support our position based on a union election. So we would urge the court, in fairness, to give the employees a chance to vote again. Thank you. Thank you very much. We'll hear from the board. May it please the court. Kelly Isbell here on behalf of the National Labor Relations Board. This court requires the board to do two things when it's issuing a bargaining order, explain the need for the bargaining order, and analyze the changed circumstances that might mitigate the need for the bargaining order. And the board did both things in this case. Yes, in the past, this court has overruled the board because it failed to do one or the other. I was having a hard time finding cases where this court has enforced a bargaining order resulting from unfair labor practices during an election since 1970. 1996, Chico Dairy, the South Asian bar. Can you tell me the cases that we've got that enforce bargaining orders? I honestly did not count them. Well, 1996, Tufo Dairy, Salvation Army was either 1996 or 1994, Aperfuel Oil Buyers Group was in 1994. You've got coating products. And can you do something to compare this case with, on the one hand, those cases where we enforced a bargaining order, and on the other hand, the remarkably many cases where we've reversed bargaining orders? Right. I can. And I will say that if you do put the cases on a timeline, what you'll see is that the board has learned from this court's admonitions. So how I would distinguish these cases is where the board . . . What exactly is it that you think you've learned? The board has begun analyzing these mitigating circumstances as this court has directed it to. And that's what you'll see in the Tufo Dairy case and the Salvation Army case and the Aperfuel Buyers case. So where the board overturns an ALJ, the ALJ found no need for a bargaining order, and the board overturns and then doesn't explain why, this court does not like that and has overruled many of those cases. That's what a lot of those cases we get overruled are. Other cases are where the board makes no attempt to analyze changed circumstances, nothing at all. There are some cases like Heads and Threads and Pace Automobile where there was a strike that occurred after the unfair labor practices, and the board makes no attempt to explain why that didn't show the employees still had a strong affiliation with the union. But in cases where the board explains the mitigating circumstances and explains why it's issuing a bargaining order, as it did in Tufo Dairy and Salvation Army, the court enforces those orders. If it makes sense. And the problem I've got with the board's position is I don't see a basis in this record for a gazelle order. First and foremost, you have lots of people here who simply apparently don't want the union. And these are adults. I mean, the notion that people can't, who are working in these circumstances in this day and time, aren't able to listen to management on the one side and the union on the other and make up their minds, I mean, these are not children. No, and we're not asserting that they are. But let's talk about the unfair labor practices here. And gazelle is quite clear that in order for the named remedy to issue, the possibility of erasing the effects through a new election has to be slight. Help me out, because I certainly don't see that on this record. You had these unfair labor practices, to be sure, but you got a 10-J injunction. You made the head of the company walk through the workforce and read the injunction. Any employee would say, we're not naked, we're not hanging out here, we've got government protection. And in addition, they're just dramatically changed circumstances, which seems to me that the board has totally failed to adequately address. Those are my concerns. OK, so I'm going to start with the changed circumstances, and then you can remind me to go back. Changed circumstances. This court looks at changed circumstances. Why wouldn't they? Isn't the simple solution to this problem to simply order another election supervised by the NLRB? No, Your Honor, and that is the point of gizzle. What gizzle explains is that after there have been disruptive unfair labor practices, the union's majority might, in fact, dissipate because of the unfair labor practices. And where the possibility of a fair election is slight, not impossible, slight, the board can issue a bargaining order. Remember what happened here. Two days before the election, the top officials in the plant and top officials at Novellus came to the plant and held mandatory employee meetings at which they told employees that they would no longer treat this plant as their personal baby. Isn't each of those people gone now? Didn't Your Honor, you mischaracterized these speeches. I went back and I read those speeches, and it seems to me, I mean, I was hard-pressed to find anything that was particularly offensive in the speeches. I mean, these are not children. I mean, they listened to a management presentation. They knew what they were hearing, and they knew what the stakes were. They knew these people have set up in this area and seen jobs disappear. This is an economically challenged area. If they've thought about anything, they've thought about their future and whether unionization is a good thing or a bad thing, and the record seems to regard these people as children unable to make rational, self-interested decisions. Remember exchange parts. When a threat is made by your employer, it sounds different to you than it does to a disinterested ear. But then you properly made the head of the company walk through the workforce and read this 10-J injunction. This is a powerful statement. That was months after the union had lost the election. Remember, they also restored benefits. The entire reason employees reached out to the union was because they took away the overtime and Sunday premiums. That was the reason. Why wouldn't a reasonable worker think, my goodness, if just mentioning a union gets them to turn around, wouldn't it be great to have the protection of a union full-time? There's a lot of ways of reading this record, and I understand that we have to defer to the board's expertise in reading the record. But I think a lot of these unfair labor practices, which I would be prepared to affirm on the strength of the board's expertise, are pretty close-run things. The board and this court have long found that threats of job loss, restoration of benefits during a union campaign, is a hallmark violation that is highly coercive. There is no question about that. Jamaica towing, highly coercive. And on this record, this is very similar to Salvation Army and Tufo Dairy. When you restore benefits, you are giving the employees exactly what they want from the union. The lesson they learn is that they don't need a union. Are you saying that in these kind of circumstances, change circumstances with regard to the workforce is basically irrelevant? I mean, the board gave very cursory examination to the change circumstances and denied Novellis's efforts to reopen the record. It really dismissed the—it says the board does not consider turnover among the bargaining unit employees or management officials in the passage of time in determining whether a gissel order is appropriate. And that's kind of a bald statement that seemed to me at odds with our court's precedent. Except that if you read what the board went on to say, it is very similar to what they said in Tufo Dairy and Salvation Army and APRA fuel buyers, and they explained. There are still, if I may— Yes, please. Go ahead. There are still a substantial number of employees who witnessed the ULPs remaining at the plant. Remember that the issue—how this court defines turnover in JLM is whether a significant number of those who witnessed the ULPs have moved on. Well, here, at the time the board issued its order—that's what the court requires, the board to look back at change circumstances at the time it issued its order—86 percent of those who were there during the time of the unfair labor practices remained employed. If the workforce had expanded by a third, why isn't it very anti-democratic to subject the whole workforce to an order that was based on a closely contested election and that was flawed in this way? Those who—at the time of the board's order, with the additional employees, those who were there during the time of the unfair labor practices made up 66 to 67 percent. Two-thirds of those employees were there at the time of the unfair labor practices. What's the objection to having—to hearing from the new employees about whether they want a union or not? I mean, this was a very, very close election. It was a very close election. Remember that in this plant of 600, they were able to get more than—to get an election, a union only has to get 30 percent of cards signed, right? They got more than 50 percent of cards signed, which is unusual. But they got the election. They got the election on the basis of— 51 out of 600, right, or 599. Right. They lost by 14 votes. After employee meetings at which the union was blamed for taking away—for trying to take away benefits. The union is trying to take away your benefits, and if they win, you're going to have to pay us back the money. I mean, remember that after the—I'm wrapping up. Remember that after the union election, they continued by demoting Mr. Hebert. Thank you very much. Thank you. Okay. We'll hear from the union now. May it please the Court, I'm Richard Breen. I'm general counsel of the Steelworkers Union. I'm here representing Union Intervenor. A couple of very quick points. First, on confusion on turnover. The company never proved turnover. The only thing that was proved was this. Excuse me. The company made a motion to reopen to offer evidence about turnover, and that motion was denied. And so it didn't have an opportunity. Yes, Your Honor, I'll comment on that. Okay, thanks. The Court said if we had considered it, it would not be controlling because a substantial number of employees still remain. But here's the point. The only thing you can prove from reading the company's exhibits, if they've been admitted, is that 86% of the old employees are still there. We have no idea how many new employees there are. It's a very carefully drafted submission where the plant, Mr. Gabriel, testified to the exact number of old employees remaining, but only the number of new employees hired since the election. He never said what the attrition was, how many there actually were. We don't know. So in terms of the 170 or 200 new employees, are you saying that could be like one guy left and was replaced 170 times? No, it could be. Or at least it could be. That's an exaggeration. It could be a loss out of the 250 roughly hired, maybe 30, 40, 50. We don't know. We don't know how many new jobs there are. Actually are there. Because remember, the way turnover is measured on a particular date, how many old employees, how many new employees, you do not know how many new employees there are here. When we've just been told, counsel's just represented to us, that the workforce is now 770 and it had been 599. But that isn't in the record, obviously, other than in this context. Right, right. And NOGO says the case you measure at the time of the date of the board's. But I am still concerned. I mean, the board denied, the novellus offered to, or requested that the matter be reopened so it could submit just the data that you're criticizing it for not. No, I think, Your Honor, what the. You're saying that Ashley Crawford was inadequate to answer that question. Exactly right. But I'm saying that also the board did consider it. The way they do in many courts around the country, the Seventh Circuit, D.C. Circuit, where these are enforced, where the board, for example, in Q1 in the Seventh Circuit, they will preserve their position and say, even if we considered, and then it gets enforced. I'd like to next a very important thing. If the law were, as the company says, we've had 48 years now of Gissel, this is what every case would look like, both in the boards and the court of appeals. You would litigate whether or not the unfair labor practice was committed. Next, forget everything you've ever read for 48 years where the labor board talks about the presumed effect from their knowledge and expertise of that ULP, and the court of appeals treats seriously with that. That's gone. What the proof would be, the only proof, is the actual impact on employees. The company would present the evidence it presented here of hundreds of people wanting to say, I didn't want the union. In my opinion, our campaign defeated it. I wasn't threatened. What does the GC have to present in rebuttal? You'd have to find employees who are willing to testify to help the union in this case, who are willing to testify that I supported the union when I signed the card. Then the company committed this coercive, unfair labor practice, and I changed my vote. You can't find those people. And the real refutation of the entire argument here is Gissel's. Because if someone was coerced, by definition, they're not going to come out and say, I really am a supporter of the union, I was frightened then. But I'm not frightened now for some reason. That's exactly right. When he is, grounds to be more frightened. You cannot find them. Then, importantly here, the real rebuttal is Gissel. The three categories talk about the tendency of an unfair labor practice. That's what it's all about. The Fifth Circuit, the J.P. Stevens case, which we cited to you, 441 F. 2nd, 514, had exactly, exactly this issue. And said you cannot prove it through individuals testifying as to why they voted. And by the way, in the Fifth Circuit, they had much better witnesses. They were union witnesses with recantations. Here, it's simply anti-union employees. Gissel still, though, underscores . . . The answer to everything you've said is just to have another election. And I'll be old supervisor. Then we'll know. Then we won't be in the position of requiring hundreds of new employees whose preferences we have no idea about to become members of the bargaining unit, a bargaining unit they may not want. Your answer, Judge Parker, is in Gissel itself. That Gissel talks about this circumstance.  They destroy a union. If a company is successful by its unfair labor practices of removing the desire for unionization or sufficiently terrorizing people, there's no need. For example, here . . . Gissel also speaks about how extraordinary those circumstances would be. And your description suggests to me that it's much more ordinary. A significant, a hallmark ULP is committed during the course of an election, an organizing campaign, that there should be a bargaining order thereafter. Whereas Gissel really stresses how unusual it is to have a bargaining order. Your Honor, I would agree and disagree that I think in this court to a degree, they've conflated the Category 1 with Category 2 in the sense that . . . Are they you're talking about us? Well, yes, prior panels. That we hear constantly this is the most extraordinary thing possible. Well, that's Category 1. This court always enforces in Category 1. But Category 2 is lesser. It's a significant hurdle. Absolutely. Because remember, this court moved away from Jamaica Towing. It suggested simply hallmark violations and give a significant mitigating circumstance. It's hallmark violations and to judge the coercive impact of those. And that's what the Board did here. Where the key, the reason that the workers wanted to organize was the problem with overtime. And they take it away. And they do threaten. And there are threatening things in that speech. The one that just jumps . . . Yes. Give me . . . I appreciate your help in parsing it because . . . Right. I read it and it seemed to me like it's electioneering. So here's the company's position. Well . . . And the union, no doubt, corrected all the misstatements in it. No, I think, Your Honor, the way I read the speech is this. He testifies . . . the speech, rather. I'm sorry. The speech he gives is this, that I had great power. I saved 140 jobs in this plant, bringing them from Quebec. And I want to tell you something. We're more expensive now. It wasn't a business decision. We're more expensive than a union plant. I did it anyway. But when the union comes, it's somehow a business decision. And now we're going to look at dollars. That's what any business does. But he ties a business decision to this, to less good terms and conditions of employment. There's a crystal clear ULP here that just jumps off the page. He takes a look at steelworker plants, I believe in Fairmont, West Virginia, and I believe in one in Indiana, and says that's where we start the bargaining with where they are. That's a crystal clear ULP. Absolutely. And, again, they hear it. They understand it. That is there. And the other thing that leaps out of that thing, the notion you stand in front of, again, the people, with a board document, this letter that you highlight, that wasn't in the charge, it was in the investigation, the board itself had determined, that they're coming after this restoration of the overtime. The thing why you got the union, and the union wants to take it away from you, when we know, in fact, the way the ULP works, is that it remains. But then you have this 10-J injunction that these men were required to read, and if I were an employer, I would find that humiliating. That's like, I remember this case where, you know, Eisenhower made him go through the entire army apologizing. Humiliating. I would not like doing this if I were an employer, and this would tell me that, you know, there are important sanctions available to protect people who are interested in union activity. I'd like to comment on that. Go ahead. Two cases. The 10-J is not complete relief, and the key case is Tradingport, the famous 10-J case in this court. But you got everything here except the gazelle order, right? Pardon me? You got everything in the 10-J injunction. Exactly right. Except the order. And that's what Tradingport talks about. It says the reason why, and this is the best 10-J law in the country in this circuit, the reason why we give the bargaining orders is that without them, the rest is meaningless, because the union's power will dissipate, the chance to represent, the ability to keep the, again, through years to keep people mobilized, when the company has access to them every day and we do not, that the union is destroyed. It cannot win the election two years from now. That's why they get the bargaining order. And, again, it's not in my power as to whether or not they would have appealed and whether or not they would have won. But that's the truth, that 10-J proves nothing. And a very, very important thing, another important case, is Skolder's. And it was written by Joseph Smith, who was on, for example, the General Stencil's panel. And what it holds is this. It reads Gissel. And what Gissel says is that this whole notion of, for example, management turnover, recurrence of unfair labour practices, did they break the law again? It's consigned to the discretion of the board. If it wants to, the board can consider it. It doesn't have to. And the reason is this. It's right in Gissel. An employer which has destroyed the union has every incentive in the world not to break the law again. It wants an election. Why not? That's the reality here. Thank you very much, Mr. Green. Thank you. Thank you. Mr. Powell, you have three minutes rebuttal, and we'll give you a little extra time. Thank you, Your Honour. Just a couple of points. The board has tried to say in its argument that it has started to listen to this court with respect to change in mitigating circumstances. It has not. In its footnote 17, the board expressly states that the board ---- It adheres to the position which has been accepted in other circuits. Excuse me? It adheres to its position which has been accepted in other circuits, but then it goes on, knowing that this is a Second Circuit case, to address the changed circumstances. It does not admit the evidence. And as the court in this case said, and as the court said in heads and threads, the board must take evidence and make appropriate findings. That is not possible without accepting the evidence. What about the comment made that the tendered evidence didn't actually establish the size of the new workforce but just talked about hiring decisions? The tendered evidence shows the number of employees who left and how much the workforce has grown. And I gave you the figures both at the time of the bargaining order, which was 770 total employees, which shows all of the relevant information necessary to determine turnover, which we calculate at present time being over 40 percent. I'm going to just revert the court to a couple of factual questions. The Quebec plant, was that a unionized plant? That is not in the record, Your Honor. That's not in the record. Do we do what is the fact, just out of curiosity? It is not in the record, Your Honor, and there's no statements about whether the ---- And you're prepared to tell us how many employees work at the plant today, which is not in the record, but you're not prepared to tell us whether, as a matter of fact, the Saguenay plant was unionized. I believe the Saguenay plant was unionized, but no reference to it being union or nonunion was made in any of the comments or speeches by the employer. So what was said was I made a decision when it was time, when we lost some work from this plant, I made the decision to close down the Quebec plant instead of taking the workers away from here and move the work from the Quebec plant to here in order to bolster this plant. And nobody in the union election had any idea that what he was saying behind that was, I closed down a union plant and moved the work here to the nonunion plant, and I may not be that nice to you anymore if you unionize. There is no evidence whatsoever in the record that any employee was aware of whether or not the Quebec plant was union or nonunion. And with respect to the ones that there is evidence in the... Unionized, though, weren't they? Yes. The company also told employees and shared the collective bargaining agreements from its longstanding relationships with the steel workers in Terre Haute and Fairmont, its locations. You've got certain conditions today, but if the union comes in, we are going to bargain with the union starting from not what the world is like today at this plant, but from the position of those other plants. Is that not a threat to take away benefits or attempt to take away benefits if the union comes in? No, because, Your Honor, bargaining is a give-and-take process. It's perfectly lawful for the company to say where it would start bargaining from, and repeatedly during the course of the campaign, the company told employees that it had the duty to bargain in good faith, that bargaining was a give-and-take process and that nobody could predict the results of collective bargaining. And it also told the workers in those meetings that the union made an unfair labor practice charge with respect to the restoration of the benefits and that that could lead to the taking away of those benefits, when, in fact, that was false, as far as the letter says. The letter doesn't say the union made this charge. There's no evidence that the union made that charge. That was something that the board came up with, as far as the letter shows. The letter says that the board is investigating the charge filed by the union and is investigating the following allegations, which included the removal or the restoration of the Sunday premium pay and overtime pay. It's certainly a reasonable interpretation of that letter to assume that the union included that as a part of its charge. But coming back to the point... It doesn't say anything about a union charge. It says, I'm writing this letter to advise you that it's necessary for me to take evidence from your client regarding allegations raised in the investigation of the above-captioned matter. We'll take affidavits about the following, and one of them is the premium pay. In the above-captioned matter, is the charge filed by the union? The above-captioned... It just... There's a... The charge number that referenced above is a charge that was filed by the union. What is the charge filed by the union, in fact? The charge filed by the union is very generic, and it says the employer, through various acts, has restrained, coerced and interfered with the employees in violation of Section 8A1 of the Act. So, is there a... There's not a mens rea requirement here. I mean, suppose the company made a good-faith mistake and charged the union with doing something that the union had not, in fact, done. Could that be... Even if it was a good-faith mistake, would that influence the election? Could that be an unfair labour practice? Well, Your Honour, with respect to the unfair labour practice, the board's decision to find that to be an unfair labour practice is actually contrary to a case that's almost directly on point in sight in our briefs, the Virginia Concrete case, where it says that the misrepresentation in a campaign of board action, the rescission of the restoration, so to speak, is not an unfair labour practice. And so we would contend that that is... Isn't there a difference between a misrepresentation about the board and a misrepresentation about the union? There is not a misrepresentation about either. And if the company was mistaken, that misrepresentation is because the board misrepresented it to Novellis. Finally, I just want to close, if I may, on the combination of change and mitigating circumstances here. Five out of the eight managers who were accused of unfair labour practices in this case are no longer employed by Novellis, significantly including CEO Martins and plant manager Smith, who the board found was particularly important in finding the unfair labour practices but has completely discounted their absence as a mitigating factor. The remedial letters that were issued by the company where they disavowed any implied threats were disregarded by the board in its footnote 17. The 10-J order and the remedial impact that they sought and obtained for the express purpose of restoring election conditions completely ignored by the board in its footnote 17. The passage of time, 3½ years now since the election, the employee turnover that we spoke about is in the record, along with the continued investment, growth and expansion of the Oswego facility communicating a positive message to the employees about their future union or not. Those mitigating and changed circumstances are substantial, they were not considered by the board, and they dictate the denial of this bargaining order under the law of this circuit. Thank you. Thank you very much. Thank you all. We'll take the matter under advisement. Well briefed, well argued.